**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Jack B Keenan,

        Plaintiff,

v.

Maricopa County Special Health Care District,

        Defendant.

No. CV-18-01590-PHX-DJH

**ORDER**

      Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 126) and Plaintiff's Partial Motion for Summary Judgment (Doc. 127). The parties have filed their respective response and replies,[1] and the matter is fully briefed. In addition, Plaintiff has filed a Motion for Sanctions (Doc. 139). Defendant has filed a Response (Doc. 142), and Plaintiff has filed a Reply (Doc. 143).[2]

## I.    Factual Background

      In June 2016, Plaintiff Dr. Jack Keenan began his medical residency at Defendant Maricopa Integrated Health System ("MIHS"). (Docs. 126 at 2; 127 at 2). The present action stems from the events that culminated in the termination of his residency in June

---

[1] Dr. Keenan filed his Response (Doc. 130) to MIHS's Motion, and MIHS filed a Reply (Doc. 135). Likewise, MIHS filed its Response (Doc. 129) to Dr. Keenan's Motion, and Dr. Keenan filed a Reply (Doc. 136).

[2] Dr. Keenan requested oral argument on both of his Motions. (Docs. 130; 139). The requests are denied. The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision. Therefore, the Court will deny the requests for oral argument. *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

2017.  As told by Dr. Keenan, his termination was the result of false complaints MIHS staff made against him and the staff's subsequent retaliatory actions.  (Docs. 1 at ¶ 26; 127 at 14).  As told by MIHS, Dr. Keenan performed poorly as a resident and was ultimately terminated for failing to follow MIHS policies.  (Doc. 126 at 3, 7).

Before Dr. Keenan's residency began, he and MIHS entered into a Resident Physician Employment Contract (the "Contract") that sets forth the terms of the residency.  (Doc. 127-1 at 7–32).  The Contract states MIHS is a "teaching institution" but that the relationship it has with Dr. Keenan "is one of employer and contract-employee."  (*Id.* at 8).  The Contract generally lists Dr. Keenan's duties, including his duty to adhere to MIHS policies and procedures.  (*Id.* at 10).  Under the Contract, MIHS is responsible for providing "grievance and due process procedures" related to resident disciplinary matters.  (*Id.* at 18).

The start of Dr. Keenan's residency did not go well.  Dr. Keenan failed his trauma rotation and received negative performance reviews.  (Doc. 126 at 4).  As a result, Dr. Elizabeth Ferguson, MIHS' Program Director ("PD") for the General Surgery Training Program and Designated Institutional Official ("DIO"), placed Dr. Keenan on "Concern Status" in February 2017.  (Docs. 126 at 5; 127 at 3).  In a letter detailing the reasons for his placement on Concern Status, Dr. Ferguson warned that "[f]urther deficiencies or issues with honesty and integrity could result in probation or even termination."  (Doc. 126-1 at 151).  As part of a "remediation plan" Dr. Keenan was required to meet on a regular basis with a mentor and the associate program director, Dr. Karole Davis.  (Doc. 126-1 at 162).

On April 10, MIHS placed Dr. Keenan on probation.  (Docs. 216 at 6; 127 at 5).  MIHS argues it did so for several reasons, including that Dr. Keenan threatened to physically harm another resident and that he failed to show up for a morning shift because he overslept.  (Doc. 216 at 6).  Dr. Keenan argues he never threatened another resident and that he overslept because Dr. Ferguson had scheduled him to work thirty-six hours in the forty-eight-hour period prior to when he was supposed to show for the next shift.  (Doc. 130 at 5–6).

Dr. Keenan appealed his placement on probation, and, on May 18, 2017, a three-

1    member Appeals Committee conducted a hearing.  (Docs. 126 at 6; 127 at 7).  On May 25,

2    2017, Dr. Keenan met with Dr. Chandrika Shankar, one of the three Appeals Committee

3    members, and Phyllis Thackrah, the Director of Academic Affairs.  (Docs. 126 at 7; 127 at

4    9).  They notified Dr. Keenan that the Appeals Committee had upheld the decision to place

5    him on probation.   During that meeting, Dr. Keenan revealed that he had recorded

6    conversations with attending physicians and faculty about his performance.  (Docs. 126 at

7    7; 127 at 9).  MIHS argues that the recordings Dr. Keenan made directly violate MIHS

8    policies that prohibit audio recording devices in the workplace and that "require employees

9    to maintain high standards of honesty and integrity."  (Doc. 126 at 7).

10         After this meeting, MIHS informed Dr. Keenan that it intended to terminate his

11   residency.  (Docs. 126 at 7; 127 at 10).  MIHS then informed Dr. Keenan he had the right

12   to meet with Dr. Eric Katz to explain why he should not be terminated.  (Doc. 126 at 7).

13   MIHS argues that Dr. Katz had been appointed as a DIO-designee to serve as a neutral

14   official.  (*Id.*)  However, Dr. Keenan declined to meet with Dr. Katz.  (Doc. 126-1 at 56).

15   MIHS then terminated the residency on June 16, 2017.  (Doc. 126 at 7)

16         Dr. Keenan subsequently sent an email contesting the reasons for his termination,

17   which MIHS construed as an appeal.  (*Id.*)  A hearing was scheduled to take place on July

18   14.  Dr. Keenan wished to record the proceedings, but the Appeals Committee declined to

19   proceed until Dr. Keenan agreed not to record the hearing.  (Docs. 126 at 8; 127 at 11).

20   The hearing was rescheduled to August 11, 2017, and the Appeals Committee subsequently

21   decided to uphold the decision to terminate Dr. Keenan's residency.  (Docs. 126 at 8; 127

22   at 12).  As articulated in an August 16, 2017, letter to Dr. Keenan, the Appeals Committee

23   reviewed whether the decision to terminate the residency "was arbitrary or taken without

24   reasonable cause."  (Doc. 126-2 at 45).  It upheld the decision, finding that Dr. Keenan's

25   failure to comply with MIHS ethics policy and his secret recording of conversations with

26   MIHS staff constituted sufficient cause.  (*Id.*)

27   **II.    Procedural Background**

28         Dr. Keenan filed his Complaint in May 2018.  (Doc. 1).  It brings six counts against

MIHS.  Counts One and Two allege MIHS placed Dr. Keenan on probation and terminated him in violation of his federal due process rights.  (*Id.* at ¶¶ 126–31).  Counts Three and Four allege MIHS breached the terms of the Contract when it placed him on probation and subsequently terminated him.  (*Id.* at ¶¶ 132–36).[3]

Discovery, as planned in the original Scheduling Order,[4] should have ended on May 3, 2019.  (Doc. 46).  After a dispute arose between the parties regarding MIHS' production of electronically stored information ("ESI"), the parties filed a Motion notifying the Court that they agreed in principle to create a "Protocol Agreement" whereby a neutral forensic expert (the "Expert") would conduct a search of MIHS computer devices.  (Doc. 70).  The parties requested the Court's assistance in settling disputes as to how the Expert should conduct a search.  (*Id.*)  The Court then issued an Order approving the Protocol Agreement and detailing what search terms the Expert would use, whether the Expert would be allowed to recommend additional terms, which computers would be forensically imaged, and how the documents would be copied and exported.  (Doc. 74).  On November 25, 2020, the Court then ordered the parties to execute the Protocol Agreement.  (Doc. 102).

The implementation of the Protocol Agreement was slow and arduous, and Dr. Keenan filed multiple motions seeking to change the Agreement's terms by reconsidering prior Orders affirming those terms.  (Docs. 112; 116).  Despite the fact that the parties had known since September 2019, at the latest, that they would need to find an Expert for the Protocol Agreement, one was not hired until February 2021.  (Doc. 113).  After more delays in the production of ESI under the Protocol Agreement, the final pieces of discovery were to be delivered to Dr. Keenan in May 2021, three years after Dr. Keenan filed his Complaint.

Now, the parties have each field a Motion for Summary Judgment, and Dr. Keenan has filed a Motion for Sanctions.  The Court begins by addressing the Motion for Sanctions.

---

[3] Counts Five and Six, the only others, were dismissed by prior Order and are therefore no longer relevant.  (Doc. 35 at 10).

[4] This matter was originally assigned to Judge H. Russel Holland.  (Doc. 3).  It was reassigned in January 2021.  (Doc. 105).

III.     **Motion for Sanctions**

Dr. Keenan seeks to sanction MIHS for failing to preserve evidence and failing to produce discovery in accordance with Court orders.  (Doc. 139 at 14–15).  Specifically, he argues MIHS failed to preserve computer devices issued to Ms. Thackrah and her assistant, Xoe McAlecee, as well as a device issued to Dr. Carol Olson, a member of the Appeals Committee that upheld Dr. Keenan's termination.  (*Id.* at 8–9).  He also argues MIHS should be sanctioned for failing to produce "native copies" of emails and documents in violation of the Court's Order.  (*Id.* at 16).  The Court begins with the argument that MIHS breached its duty to preserve evidence.

### a.   Duty to Preserve & Spoliation

Parties have a duty to preserve evidence they know or should know is relevant to future litigation.  *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011).  Once the duty is raised, a failure to preserve evidence raises spoliation issues.  *Id.*  If ESI that should have been preserved is lost because a party failed to take reasonable steps to preserve it, and the ESI cannot be restored or replaced, the court "may order measures no greater than necessary" to cure prejudice suffered by another party, or it may enact sanctions upon finding a party acted with the intent to deprive another party of information.  Fed. R. Civ. P. 37(e).  The party seeking spoliation sanctions bears the burden of establishing that such measures or sanctions are warranted.  *Surowiec*, 790 F. Supp. 2d at 1005.

MIHS does not contest that it had a duty to preserve the devices, nor does it contest that the devices were destroyed.  Therefore, the Court will focus its inquiry on whether MIHS acted with the intent to deprive Dr. Kennan of the information contained on the devices and whether Dr. Keenan has been prejudiced as a result.

### i.   Background to the Devices

On February 7, 2020, MIHS alerted Dr. Keenan to the fact that the devices assigned to the three individuals had been erased and overwritten as part of a 2016 "initiative to replace and update the devices issued to personnel."  (Doc. 139-1 at 91–93).  MIHS told

Dr. Keenan that "Xoe McAleece's device was replaced on December 14, 2017; Dr. Carol Olson's device was replaced on June 21, 2018; Phyllis Thackrah's device was replaced on August 21, 2018." (*Id.* at 92). The parties had contemplated searching the devices of Ms. Thackrah, Ms. McAlecee, and Dr. Olson since at least September 24, 2019. (Doc. 70-1 at 5). And pursuant to this Court's October 2019 Order, those individuals' MIHS desktop computers would be searched by the Expert under the Protocol Agreement. (Doc. 74 at 6).

On November 13, 2020, MIHS notified the Court that the devices had been destroyed. (Doc. 100 at 4). Within that notification, MIHS represented that it had provided Dr. Keenan with an affidavit outlining the nature of the 2016 initiative, which replaced over four thousand computer devices. (*Id.* at 5 n.2). The affidavit itself, proffered by MIHS' Senior Vice President Information Technology and Chief Information Officer, was signed in May 2020. (Doc. 139-1 at 95–98). When MIHS notified the Court, Dr. Keenan did not raise any argument that MIHS had spoiled evidence. (*See* Doc. 100 at 7–9). Instead, Dr. Keenan requested to have his expert inspect MIHS information systems. (*Id.*) The Court denied this request, finding that "the parties have fully engaged one another . . . and have developed the appropriate inventory of devices and data to be forensically examined." (Doc. 102 at 2).

On February 1, 2021, Dr. Keenan filed a Motion to Reconsider, in which he acknowledged, almost a year after receiving notice from MIHS, that the devices had been destroyed. (Doc. 109 at 5). Dr. Keenan requested that a special master be employed to determine if the devices were, in fact, destroyed. (*Id.* at 11). Although he questioned MIHS' credibility, he never actually requested sanctions resulting from spoliation. (*Id.* at 12). The Court denied both of Dr. Keenan's requests to reconsider the prior Order and to appoint a special master. (Doc. 112 at 3). In doing so, the Court noted that Dr. Keenan was only implying that MIHS had spoiled evidence, and that the Court would only consider such allegations if properly made in a motion. (*Id.*) On October 28, 2021, after each party had filed summary judgment motions, Dr. Keenan filed a Motion seeking sanctions against MIHS for spoliation of evidence.

### ii.  Whether MIHS Acted with Intent

Although neither the Federal Rules of Civil Procedure ("the Rules") nor the Ninth Circuit have defined intent in the context of spoliation, the Advisory Committee notes to the Rules state that negligent "or even grossly negligent behavior does not logically support" the inference that a party acted with intent.  Fed. R. Civ. P. 37, advisory committee's note to 2015 amendment.  "Accordingly, courts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that the a [sic] party purposefully destroyed evidence to avoid its litigation obligations."  *Porter v. City & Cty. of San Francisco*, 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018).[5]

Dr. Keenan argues that several circumstances permit the inference that MIHS intended to deprive Plaintiff of the devices.  (Doc. 139 at 19).  He points to the "timing of the loss, MIHS's failure to be candid with the Court or Plaintiff about preservation issues," MIHS' status as a sophisticated party represented by counsel, and the fact that MIHS had the devices under its control.  (*Id.*)

The Court finds that MIHS was grossly negligent in failing to preserve and keep track of the devices.  It is, as Dr. Keenan argues, a sophisticated party with control over the devices in question.  MIHS does not contest Dr. Keenan's assertion that the duty to preserve the devices arose in August 2017.  Clearly, MIHS should have taken greater steps to safeguard the devices, which were destroyed within a year of when the duty arose.  Furthermore, even after the destruction, MIHS failed to take an adequate inventory of the devices until 2020, when it realized the devices had been destroyed.

Although MIHS was plainly careless, the Court does not find sufficient evidence to show that MIHS purposefully destroyed the devices to avoid litigation obligations.  The devices were destroyed as part of a 2016 program to update and replace MIHS devices.  (Doc. 139-1 at 92).  MIHS provided Dr. Keenan with an affidavit, dated May 2020,

---

[5] Dr. Keenan cites *Christoffersen v. Malhi*, 2017 WL 2653055, (D. Ariz. June 20, 2017), which found that negligence or gross negligence is sufficient to show intent.  (Doc. 139 at 18).  The Court declines to follow *Christoffersen* because it cites primarily to cases that were decided before Rule 37's 2015 amendment.  *See* 2017 WL 2653055, at *5.

detailing the nature of this program.  (*Id.* at 95–98).  Dr. Keenan has not made any showing that this program was initiated to avoid litigation obligations.  In addition, the Court does not find that MIHS lacked candor with Dr. Keenan or the Court.  This particular issue concerning the devices has been well-known and established on the record for years.  In addition, Dr. Keenan fails to show that MIHS intentionally misrepresented the condition of the devices or that it intentionally delayed notifying Dr. Keenan that the devices had been destroyed.  Therefore, the Court finds that although MIHS was grossly negligent, Dr. Keenan has not shown that MIHS intentionally destroyed the devices to skirt its legal duties.

### iii.  Whether Dr. Keenan Suffered Prejudice

The next question is whether Dr. Keenan suffered prejudice as a result of the devices destruction.  This determination is one of judicial discretion.  Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.  The comments to Rule 37's 2015 amendments provide some guidance to courts, advising them that an "evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation."  *Id.*

Dr. Keenan argues the prejudice he suffered is that he will never know what was on those devices and, if he had known, he might have conducted discovery differently.  (Doc. 139 at 16–17).  He also notes that other evidence recovered from the available devices demonstrates that Dr. Ferguson engaged in retaliatory behavior.  (*Id.*)  The Court presumes, although Dr. Keenan never says so explicitly, that he believes the information lost on the devices could have further demonstrated retaliatory behavior. Whether Dr. Ferguson engaged in such retaliatory behavior, as will be further explained below, is an issue related to Dr. Keenan's breach of contract claims.

The Court finds that Dr. Keena has not demonstrated that he suffered prejudice.  The Court so finds for two reasons.  First, Dr. Keenan argues the evidence on the devices might have shown that Dr. Ferguson engaged in retaliatory behavior.  Dr. Keenan already claims to have enough evidence showing that Dr. Ferguson engaged in retaliatory behavior to

warrant summary judgment in his favor.  (Docs. 127; 130).  Therefore, even assuming that further evidence of retaliation was present on the drives, its impact on the overall evidence collected by Dr. Keenan would likely be marginal, at best.

Second, there is an immense delay between when Dr. Keenan first learned of the devices' destruction, February 2020, and when he filed his Motion for Sanctions, October of 2021.  Dr. Keenan waited over a year and a half before seeking sanctions for the lost devices.  The Court also notes that at a February 2, 2021, status conference, Dr. Keenan's counsel acknowledged that he never subpoenaed the depositions of Ms. Thackrah, Ms. McAlecee, or Dr. Olson.  (Doc. 112 at 4).  In fact, at that time, nearly three years after Dr. Keenan had filed his Complaint, the only discovery Dr. Keenan's counsel remembered conducting consisted of two depositions and some interrogatories and requests for production.  (*Id.*)  Dr. Keenan's minimal efforts in discovery as well as the immense delay in seeking sanctions show that his claims of prejudice are exaggerated.

In sum, the Court finds that sanction sunder Rule 37(e) for spoliation of ESI are not warranted.

**b.  Production of Native Copies of Documents**

Dr. Keenan also argues that sanctions are warranted against MIHS for failing to produce thirteen "native copies" of emails and documents in accordance with a prior Order (Doc. 51).  (Doc. 139 at 16).  A party that fails to obey a court order is subject to sanctions.  Fed. R. Civ. P. 37(b); *see also* Fed. R. Civ. P. 16(f)(1)(C) (stating courts may also sanction a party or attorney that "fails to obey a scheduling or other pretrial order").

Dr. Keenan has made this argument before, and now he essentially seeks reconsideration of another Order denying this issue as moot.  For context, the Court had originally ordered MIHS to produce certain emails to Dr. Keenan "in their native form with all metadata intact within twenty-one days of the date of this order."  (Doc. 51 at 3).  MIHS then produced 148 documents in their native format.  (Doc. 142 at 4) (citing (Doc. 70 at 23–24)).  Dr. Keenan then argued that he had not received some documents in native format in an effort to persuade the Court that a forensic examination was justified.  (Doc. 70 at 19).

1    Because the parties had agreed to a forensic examination under the Protocol Agreement,

2    the Court dismissed this issue as moot.  (Doc. 74 at 8).

3            In response, MIHS argues Dr. Keenan's current request for the thirteen documents

4    is frivolous because MIHS has already delivered some of the documents to Dr. Keenan,

5    some of the documents are privileged, and the remaining documents originated from

6    District Medical Group, Inc. ("DMG"), a non-party, and so MIHS did not have access to

7    the native versions.  (Doc. 142 at 4 n.2).    Dr. Keenan does not respond to these

8    representations in his Reply.

9            The Court finds that MIHS has not disobeyed the Order (Doc. 70) directing it to

10   produce native forms of documents.  This issue has already been deemed moot, and Dr.

11   Keenan fails to respond to MIHS' argument that his request for the thirteen documents is

12   frivolous.  The Court, therefore, denies Dr. Keenan's request for sanctions on the grounds

13   that MIHS failed to produce these documents.

14           **c.  MIHS Self-Collection**

15           Finally, Dr. Keenan argues that the production of documents as a result of the

16   Protocol Agreement shows that MIHS failed to fulfill its discovery obligation under

17   Federal Rule of Civil Procedure 26(a)(1) and General Order 17-08.  (Doc. 139 at 4).  Under

18   the Federal Rules, a party has a duty to disclose "a copy—or a description by category and

19   location—of all documents, electronically stored information, and tangible things that the

20   disclosing party has in its possession, custody, or control and may use to support its claims

21   or defenses, unless the use would be solely for impeachment."   Fed. R. Civ. P.

22   26(a)(1)(A)(ii).  General Order 17-08 requires a party to disclose ESI in the form of a list

23   of documents or categories of documents.  It also requires, should an ESI dispute arise, that

24   the parties seek judicial resolution on how ESI will be produced, including what

25   requirements, limitations, search terms, and in what form the ESI will be produced.  If a

26   party fails to provide information under Rule 26(a), that party may be sanctioned unless

27   the failure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).

28           Dr. Keenan argues that the production of 128 new documents as a result of the

- 10 -

Protocol Agreement shows that MIHS failed to fulfill its discovery obligations under Rule 26 and General Order 17-08.  (Doc. 139 at 14).  He also speculates that the absence of emails produced for some MIHS staff indicates that there are other relevant documents MIHS has still not produced.  (*Id.* at 16).  MIHS argues that Dr. Keenan's claims of new documents are misleading because a substantial portion of the "new" documents were obtained from the non-party DMG in this case, not MIHS, and several others were already produced.  (Doc. 142 at 9).  In his Reply, Dr. Keenan argues that MIHS should have been able to obtain the DMG emails because it controlled the devices that Drs. Katz and Ferguson used.  (Doc. 143 at 7).

The Court declines to sanction MIHS for a deficient self-collection.  Dr. Keenan previously argued that MIHS' self-collection was deficient.  (Doc. 47).  The result of that dispute was the Protocol Agreement to arrange Court-approved terms of ESI collection. (Doc. 102).  That more documents would be produced as a result of the Protocol Agreement was a reasonably foreseeable outcome.  In fact, the production of additional documents as a result of the Protocol Agreement is the remedy Dr. Keenan originally sought by claiming MIHS had conducted a deficient search.  The Court declines to impose sanctions because any failure by MIHS to produce documents in accordance with Rule 26 or General Order 17-08 has been rendered harmless by the Protocol Agreement and the subsequent production of documents.  Moreover, Dr. Keenan's speculation that other documents exist because of the absence of certain categories of document production is unsubstantiated and does not warrant sanctions.

**d.  Conclusion**

The Court denies Dr. Keenan's Motion for Sanctions.  The Court notes that the majority of the relief that Dr. Keenan has sought amounts to a reopening of discovery.  But all discovery in this matter has ended, and the Court does not find grounds to reopen it in Dr. Keenan's Motion for Sanctions.  The Court now turns to the parties' motions for summary judgment.

/ / /

## IV.    Motion for Summary Judgment Standard

The parties seek summary judgment on Dr. Keenan's due process and breach of contract claims.  A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A factual dispute is genuine when a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here, a court does not weigh evidence to discern the truth of the matter; it only determines whether there is a genuine issue for trial.  *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).  A fact is material when identified as such by substantive law.  *Anderson*, 477 U.S. at 248.  Only facts that might affect the outcome of a suit under the governing law can preclude an entry of summary judgment.  *Id.*

The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute.  *Celotex*, 477 U.S. at 323.  Once shown, the burden shifts to the non-moving party, which must sufficiently establish the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.  But if the non-movant identifies "evidence [that] is merely colorable or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50 (citations omitted).  "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997).

## V.    Constitutional Due Process Claims

Dr. Keenan claims MIHS violated his federal due process rights when it placed him on probation and terminated him.  (Doc. 1 at ¶¶ 126–31.)  The Fourteenth Amendment of the United States Constitution guarantees that states shall not "deprive any person of life,

liberty, or property without due process of law. . . ." U.S. Const amend. XIV § 1.  Due process claims may be either be procedural or substantive.  *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994).  Procedural due process ensures the government abides by minimum procedural safeguards when protected interests are at stake.  *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017).  Substantive due process protects individuals from arbitrary or bad faith deprivations of protected interests. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 224–25 (1985); *Moore v. Parks*, 141 F.3d 1177 (9th Cir. 1998) (finding "a student has a substantive due process right protecting her from an arbitrary or bad faith dismissal"); *Haberle v. Univ. of Ala. in Birmingham*, 803 F.2d 1536, 1539 (11th Cir. 1986) (analyzing issues related to faculty's professional judgment under substantive due process).  The Court begins with a discussion of Dr. Keenan's procedural due process claims.

### a.  Procedural Due Process

To show a violation of procedural due process, a plaintiff must show he was deprived of a constitutionally protected liberty or property interest in life, liberty, or property.  *Haggard v. Curry*, 631 F.3d 931, 935 (9th Cir. 2010).  He must then show he was denied adequate procedural protections for those interests.  *Id.*

### i.  Protected Interests

There are two separate instances during which Dr. Keenan argues his protected interests lacked procedural protections: when he was put on probation and when he was terminated.  During the termination, Dr. Keenan argues the protected interest at stake was his ability to finish his residency under the Contract.  (Doc. 127 at 17).  MIHS does not contest this.  Government employees may have a protected interest in their continued employment if "the terms of the employment make it clear that the employee can be fired only for cause."  *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 922 (9th Cir. 2013) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–78 (1972); *Perry v. Sindermann*, 408 U.S. 593, 599–603 (1972)).  The Contract itself lists only certain reasons why the residency may be terminated.  (Doc. 127-1 at 18).  In addition to the contractual

interest, a liberty interest is at stake when a public employee is terminated for reasons that impair "a reputation for honesty or morality." *Tibbetts v. Kulongoski*, 567 F.3d 529, 535 (9th Cir. 2009).  There is no dispute that an explicit reason for Dr. Keenan's termination was, as the Appeals Committee wrote, for ethical concerns. (Doc. 126-2 at 45).  Therefore, the Court finds the undisputed evidence shows Dr. Keenan was deprived of both a property and liberty interest when he was terminated.

During his placement on probation, Dr. Keenan argues the protected interest at stake was his professional reputation. (Doc. 130 at 14).  He argues that the probation harms his reputation in such a way that will negatively impact his future career opportunities. (*Id.*)  There are times when part of a liberty interest includes "a person's good name, reputation, honor, or integrity . . . ." *Endy v. City of Los Angeles*, 975 F.3d 757, 764 (9th Cir. 2020) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).  However, it is too abstract to simply claim that the government has stigmatized one's reputation. *Paul v. Davis*, 424 U.S. 693, 711 (1976).  Therefore, courts apply a "stigma-plus" test to claims of reputational harm, which requires a plaintiff show some other "deprivation of liberty or property by the state that directly affects the plaintiff's rights." *Miller v. California*, 355 F.3d 1172, 1178 (9th Cir. 2004).  For example, if a state employee is terminated and the termination entails public charges that impair a reputation for honesty and morality, the reputational damage (the "stigma") coupled with the interest in continued employment (the "plus") create a cognizable liberty interest under the due process clause. *See Tibbetts v. Kulongoski*, 567 F.3d 529, 538 (9th Cir. 2009).

MIHS argues that because Dr. Keenan's probation did not change his title, pay, or hours, he has not established a protected interest. (Doc. 126 at 10).  Dr. Keenan concedes in his deposition that there was no impact on his title, pay, or hours, and he does not dispute the point in briefing. (Doc. 126-1 at 32).  Therefore, the only interest Dr. Keenan claims was at stake during his probation was his professional reputation, which, by itself, is not a protected interest. *See Paul*, 424 U.S. at 711; *Tibbetts*, 567 F.3d at 538.  Therefore, the Court finds the undisputed facts show the decision to place Dr. Keenan on probation did

1   not deprive him of a protected interest.

2              **ii.  Adequate Procedural Protections**

3         Dr. Keenan shows he was deprived a protected interest during his termination.

4   Next, he must show that he was denied "adequate procedural protections."  *Roybal*, 871

5   F.3d at 931.  Whether a procedural protection is adequate depends on the nature of the

6   deprived interest. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  The Supreme Court has

7   described "the root requirement" of the Due Process Clause as notice and the opportunity

8   to be heard.  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting

9   *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (original emphasis)).  A hearing, however,

10   "need not be elaborate."  *Id.* at 546.  Although hearings are generally conducted before

11   some right is deprived, the Court has also held that post-deprivation hearings are also

12   acceptable.  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *see also Reinlasoder v. City of*

13   *Colstrip*, 657 F. App'x 636, 638 (9th Cir. 2016) (finding that state employees may be

14   entitled to a hearing after being terminated).   To determine exactly what process is

15   constitutionally required, courts consider three factors:

> 16  First, the private interest that will be affected by the official action; second,
> 17  the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> 18  safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> 19  substitute procedural requirement would entail.

20   *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

21         Dr. Keenan does not dispute that he had the opportunity to meet and be heard by Dr.

22   Katz prior to his termination, nor does he dispute that he declined that opportunity.  He

23   admits as much in his deposition.  (Doc. 126-1 at 56).  The parties also do not dispute that

24   Dr. Keenan was provided with a post-termination hearing to appeal the decision.

25   (Docs. 126 at 7; 127 at 11).  However, Dr. Keenan argues his due process rights were

26   violated because the post-termination appeal hearing was inadequate.  (Doc. 127 at 18).

27   He argues he did not have enough time to review evidence, he was not allowed to cross-

28   examine witnesses, he was not allowed to present his own evidence or witnesses, and he

was not permitted to have a lawyer present.  (*Id.*)[6]

The Court finds that Dr. Keenan's termination process afforded adequate protections for his protected interests.  In making this decision, the Court bears in mind the three *Matthews* factors.  *See* 424 U.S. at 335.  First, Dr. Keenan certainly has a great interest in his professional reputation and the completion of his residency.  However, and second, the procedure MIHS had in place was more than adequate to safeguard against erroneous decisions.  The undisputed evidence shows MIHS provided Dr. Keenan with notice of its intent to terminate him, provided him an opportunity to be heard before termination, which Dr. Keenan declined, and MIHS and provided him with a post-termination hearing conducted by the three-member Appeals Committee.  Finally, MIHS has an interest in terminating residents who fail to meet its standards for the safety of patients.  Further procedural requirements that essentially turn a hearing into a trial with attorneys would require doctors to be burdened with the role of actual judges.  *See id.* at 348 ("The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.").  Such "elaborate" proceeding go above and beyond what procedural due process requires in this instance.  *See Loudermill*, 470 U.S. at 542.[7]

In support of his contention that these procedural aspects were required at the appeals hearing, Dr. Keenan cites two cases without explaining their significance. (Doc. 127 at 18).  First, he cites *Goldberg v. Kelly*, where the Court held that welfare recipients must be given the opportunity for an evidentiary hearing when their benefits are at risk.  397 U.S. 254, 270 (1970).  This included the right to cross-examine witnesses and

---

[6] To some extent, whether MIHS was required to permit cross-examination or additional witnesses at the post-termination hearing is moot.  Dr. Keenan does not cite to anything in the record to support his claims that he was denied these abilities.  MIHS cites to Dr. Keenan's deposition, in which Dr. Keenan states he did have the ability to cross-examine Dr. Ferguson and call witnesses but declined to do so.  (Doc. 129-1 at 53–56).

[7] MIHS argues that Plaintiff is properly considered a student, so the level of procedural afforded need not be as great as if he were an employee.  (Doc. 126 at 8–9) (citing *Shaboon v. Duncan*, 252 F.3d 722, 732 (5th Cir. 2001)).  The Court need not decide this issue because the procedural protections afforded were adequate, regardless of whether Dr. Keenan is a student or employee.

the right to retain an attorney.  *Id.*  Second, he cites *Mathews*, which held that evidentiary hearings were not required before the government terminated Social Security disability benefits.  424 U.S. at 349.  But the Court finds that the nature of the interest at issue in those cases, the review of social welfare benefits, is distinguishable from the interest here, Dr. Keenan's interest in his reputation coupled with his interest in the residency Contract.  *See Morrissey*, 408 U.S. at 481 (stating the required level of due process depends on the interest at stake).  This matter is more comparable to *Loudermill*, where the Court discussed the procedural protections necessary when terminating a state employee.  470 U.S. at 547–48.  The Court held all that was required was notice and an opportunity to respond before the termination and whatever post-termination procedures state law required.  *Id.*  Dr. Keenan makes no argument as to why the *Mathews* factors require more procedural protections than were required in *Loudermill*, and so the Court will not deviate from this precedent.

As a matter of law, and there otherwise being no genuine dispute of material fact, the Court finds MIHS did not violate Dr. Keenan's procedural due process rights in placing him on probation and subsequently terminating him.  MIHS provided Dr. Keenan with a pretermination opportunity to respond, which he declined, as well as a post-termination hearing.  That the hearing did not afford him all the procedural features afforded to welfare and disability beneficiaries did not make the hearing unconstitutional.  The procedural due process claims are therefore dismissed.  The Court now turns to Dr. Keenan's substantive due process claims.

### b.  Substantive Due Process

Here, Dr. Keenan argues enmity from MIHS staff tainted the decision to terminate him, which was ultimately so arbitrary and unreasonable that it violated his substantive due process rights.  (Doc. 130 at 14).  A substantive due process claim, like its procedural counterpart, requires a plaintiff show the government deprived him of a protected interest.  *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).  Once a protected interest is shown, substantive due process claims generally require the plaintiff show that the government

1    arbitrarily deprived him of the interest.  *Id.*

2         The Court has already found the undisputed evidence shows that a protected interest

3    was only deprived during Dr. Keenan's termination, and so it is unnecessary to discuss his

4    substantive due process claims to the extent they relate to the decision to place him on

5    probation.  Therefore, the Court will proceed by discussing whether MIHS violated Dr.

6    Keenan's substantive due process rights when it terminated him.

7                   **i.  Arbitrary Deprivation of Protected Interest**

8         The type of arbitrary conduct that rises to a substantive due process violation is the

9    type that "shocks the conscience" and so "interferes with rights implicit in the concept of

10   ordered liberty."  *United States v. Salerno*, 481 U.S. 739, 746 (1987) (internal citations and

11   quotations omitted).  It is conduct that is "intended to injure in some way unjustifiable by

12   any government interest[.]"  *City of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  The

13   precise standard of conduct that constitutes a substantive violation depends on the context.

14   For example, when government action prevents a plaintiff from pursuing an occupation,

15   the plaintiff must show the action was "arbitrary and lacking a rational basis" to raise a

16   substantive due process claim.  *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir.

17   2007), *aff'd sub nom.* 553 U.S. 591 (2008).  In cases of "abusive executive action . . . only

18   the most egregious official conduct can be said to be 'arbitrary in the constitutional

19   sense[.]'"  *Lewis*, 523 U.S. at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115,

20   129 (1992)).  In the context of a school's dismissal of a student for academic reasons, the

21   student must show the reasons for dismissal were the result of "careful deliberation" and

22   not "such a substantial departure from accepted academic norms as to demonstrate that the

23   person or committee responsible did not actually exercise professional judgment."  *Ewing*,

24   474 U.S. at 225; *see also Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85

25   (1978) (finding no violation of substantive due process rights, in part, because the decision

26   to dismiss a medical student was "careful and deliberate").

27        The  parties  themselves  provide  imprecise  and  contradictory  articulations  of

28   appropriate context and substantive due process standard the Court should employ here.

Dr. Keenan argues the standard should be whether the evidence shows MIHS failed to "exercise professional judgment." (Doc. 127 at 14). This partial standard appears in *Ewing*, in which the Court discussed the substantive due process rights of students who were dismissed from public schools for academic reasons. 474 U.S. at 225. However, Dr. Keenan himself argues he was a MIHS employee, not a student, and that he was dismissed for disciplinary, not academic, reasons. (Doc. 130 at 6). In a similarly contradictory manner, MIHS, argues the substantive due process standard here should be whether the evidence shows MIHS acted arbitrarily and without a rational basis. (Doc. 126 at 9, 14). This standard is usually used for deprivations of occupational liberty after a government entity has terminated a person's employment. *See Engquist*, 478 F.3d at 997. And yet MIHS argues Dr. Keenan was a student dismissed for academic reasons. (Doc. 126 at 9).

Despite the various wording of legal standards, the Court finds, for reasons discussed below, that Dr. Keenan's substantive due process claims fail under any of the standards presented to the Court. To explain why, the Court turns to the undisputed facts regarding MIHS' conduct when terminating Dr. Keenan.

### ii.  MIHS' Conduct

The Contract between Dr. Keenan and MIHS provides that failure to abide by MIHS policies may be grounds for termination. (Doc. 127-1 at 10). According to the Appeals Committee, Dr. Keenan was terminated for violating two MIHS policies related to his recordings of MIHS staff. (Doc. 126-2 at 45). First, MIHS policy prohibits the use of audio recorders in the "workplace" (the "Recording Policy"). (*Id.* at 49). The stated purpose of the Recording Policy is to prohibit the use of communication devices "when such activity undermines privacy" and it requires such devices to be used in a way that "respects individual rights to privacy." (*Id.* at 48). Second, MIHS policy requires its staff to maintain "high standards of honesty, integrity, impartiality and conduct . . ." (the "Ethics Policy"). (*Id.* at 90).

The Appeals Committee stated that during its review, Dr. Keenan disclosed he had "recorded conversations with faculty members without their knowledge." (*Id.* at 45). The

Appeals Committee found that the recordings violated MIHS' Recording Policy.  (*Id.*) Furthermore, because the recordings were made in secret, the Appeals Committee found they did not demonstrate "professional or honest practice" and that they demonstrated "a lack of insight into the boundaries of ethical behavior," thereby violating the Ethics Policy. (*Id.*)

The parties do not dispute that Dr. Keenan recorded conversations with MIHS faculty.  (Docs. 126 at 7; 127 at 9).  The parties do not dispute that these conversations related to Dr. Keenan's performance as a resident.  (*Id.*)  In addition, Dr. Keenan never disputes that the recordings were made in secret.  Instead, Dr. Keenan argues that the policy's term "'workplace' implies the Rule is limited to situations where a physician is providing patient care."  (Doc. 127 at 15).  Therefore, because Dr. Keenan only made his recordings outside of that setting, but still on the MIHS "premises," he argues he did not violate the policy.  (*Id.*)

The Court rejects Dr. Keenan's interpretation.  First, the Recording Policy's plain language prohibiting recordings at the workplace does not support Dr. Keenan's proposed interpretation.  As stated in the Contract, the "primary purpose" of Dr. Keenan's residency was "education."  (Doc. 127-1 at 8).  His work, therefore, entailed discussions with MIHS Staff about his performance.  In addition, Dr. Keenan does not dispute that the recordings took place at the hospital, his place of work and education.  Second, even assuming the Recording Policy were limited to the extent Dr. Keenan suggests, he admits that he recorded conversations about patient care.  He states he "wiped out any part of the conversation involving patient care." (Doc. 127 at 15).  But while the recordings may have been deleted, they still violated the Recording Policy.  Therefore, there is no genuine dispute of material fact that Dr. Keenan violated MIHS policies by secretly recording conversations with MIHS staff, about his performance and patient care, at the workplace.

As to the Appeal Committee's finding that Dr. Keenan violated the Ethics Policy, Dr. Keenan argues that MIHS "never explained why recording a conversation to which one is a party constitutes a breach of honesty and integrity standards."  (*Id.* at 16).  He also

argues that he made the recordings "for protection" because he no longer trusted MIHS staff.  (*Id.*)  The claimed breach of policy, he argues, is a "bootstrap argument given the weakness of the factual allegation in the context of the policy."  (*Id.*)

The Court first notes that the recordings alone were sufficient grounds to terminate Dr. Keenan's residency.  Second, the record shows that the Appeals Committee wrote to Dr. Keenan that secretly recording colleagues was not professional or honest because it did "not support a collegial learning environment, especially in a health care setting involving patient care."  (Doc. 126-2 at 45).  The Appeals Committee also noted that even after Dr. Keenan was notified that his recordings violated MIHS policy, he "persisted in asserting" that he could do so.  (*Id.*)

The Court has no difficulty understating how secret recordings of hospital staff by their colleagues demonstrate a lack of honesty and integrity, and it finds that a reasonable jury would not, either.  Dr. Keenan argues he never told a lie by making the recordings. (Doc. 127 at 15).  But deceit can craft its disguise out of silence or speech.  Therefore, the Court finds there is no genuine dispute of material fact that Dr. Keenan violated the MIHS Ethics Policy.

In addition, there is no genuine dispute of material fact that Dr. Keenan violated MIHS policies and that MIHS terminated his residency for those policy violations.  The Court finds that no reasonable jury would say MIHS' decision to terminate Dr. Keenan shocks the conscience, nor could a reasonable jury say MIHS' decision was arbitrary, demonstrated a lack of professional judgment, or was not the result of careful deliberation.

### c.  Conclusion

The undisputed evidence shows Dr. Keenan fails to make any due process claim from the events that surrounded his probation or termination.  Therefore, the Court finds that MIHS is entitled to judgment in its favor on Counts One and Two.

## VI.   Breach of Contract

Dr. Keenan also claims MIHS breached the terms of the Contract when it placed him on probation and then terminated him.  (Doc. 1 at ¶¶ 132–36).  In Arizona, a breach of

contract claim requires showing the existence of a contract, a breach of that contract, and resulting damages.[8]  *Clark v. Compania Ganadera de Cananea, S.A.*, 387 P.2d 235, 238 (Ariz. 1963).  When interpreting contracts, courts determine the parties' intent by looking "to the plain meaning of the words as viewed in the context of the contract as a whole." *United Cal. Bank v. Prudential Ins. Co.*, 681 P.2d 390, 411 (Ariz. Ct. App. 1983).

The parties focus their briefing on whether there was a breach.  Dr. Keenan argues MIHS breached the Contract by failing to abide by its own procedural policies during his probation and termination.  (Docs. 127 at 13–14; 130 at 10).  In addition, he argues that MIHS breached the Contract by retaliating against him for appealing his probation. (Doc. 127 at 16).  MIHS argues that the Contract does not require it to abide by MIHS procedural policies when deciding to terminate a resident and that, even if it did, any breach was immaterial.[9]  (Doc. 129 at 8–12).  It also argues that the Contract only provided Dr. Keenan the right to be free from retaliation with regard to decisions to terminate him, and because the undisputed facts show the termination resulted from the recordings, Dr. Keenan fails to show retaliation.  (*Id.* at 13).

The Court will begin by addressing whether MIHS breached the Contract by failing to follow its own policies.  Then it will address whether MIHS breached the Contract by retaliating against Dr. Keenan.

### a.  MIHS Procedural Policies

The first question is which policies MIHS was obligated to uphold.  The Contract provides that MIHS "will provide grievance and due process procedures for the Resident . . . in resolving matters regarding resident disciplinary actions . . . ."  (Doc. 127-1 at 18).  It

---

[8] The Court notes that neither party fully addressed the question of what Dr. Keenan's contractual damages are.  MIHS only went so far as to argue that Dr. Keenan had not evidenced damages in his Partial Motion for Summary Judgment.  (Doc. 129 at 2).  In his Reply, Dr. Keenan asserts he only sought summary judgment on the issue of whether MIHS breached the Contract, not whether he had established damages.  (Doc. 136 at 12).

[9] Specifically, MIHS argues the alleged breaches are immaterial and so Dr. Keenan is not entitled to summary judgment in his favor.  (Doc. 192 at 12).  This argument is without merit.  A party that suffers from an immaterial breach is still entitled to damages. *Zancanaro v. Cross*, 339 P.2d 746, 750 (Ariz. 1959) ("Ordinarily the victim of a minor or partial breach must continue his own performance, while collecting damages for whatever loss the minor breach has caused him . . . .").

also states that a resident subject to termination is "entitled to a due process hearing consistent with the provisions of the MIHS Resident Manual and the MIHS Resident Policies and Procedures . . . ." (*Id.* at 19).  Although MIHS argues Dr. Keenan was only entitled to the policy protections when it sought to terminate his residency, a plain reading of the Contract shows that he was entitled to the procedures during his probation, too.  *See United Cal. Bank*, 681 P.2d at 411.  MIHS' promise to provide due process procedures for disciplinary actions plainly entails the procedures established in MIHS policy for probation, not just termination.

The next question, then, is whether the evidence shows MIHS violated its policies.  The procedures that Dr. Keenan argues MIHS violated are found in the policies governing "Resident Discipline & Termination" (the "Discipline Policy") and "Resident Due Process and Appeals" (the "Appeals Policy").  (Doc. 127-1 at 20–32).  Under the Discipline Policy, a "Program Director" ("PD") must present documentation warranting concern status for approval to the "Designated Institutional Official" ("DIO") or her designee.  (*Id.* at 23).  In the event that the PD and the DIO are the same person, the Discipline Policy states that the DIO must recuse herself from the approval and that the Director of Academic Affairs will appoint a DIO designee.  (*Id.* at 22).   Under the Appeals Policy, the Appeals Committee is a three-member group comprised of the Chair of the GMEC,[10] the Medical Staff President, and the President of the Resident Council.  (*Id.* at 28).  If a member of the Appeals Committee has a "conflict of interest" the Director of Academic Affairs must designate an alternate.  (*Id.* at 28).  The Appeals Policy also allows residents to ask questions of witnesses and the PD.  (*Id.* at 31).  It also requires all witness interviews "be documented."  (*Id.*)

Dr. Keenan argues MIHS violated the Discipline Policy when Dr. Ferguson "unilaterally" placed him on concern status without seeking a DIO-designee because she was both the PD and DIO.  (Doc. 127 at 5, 12).  The parties do not dispute that Dr. Ferguson served as both a PD and a DIO.  MIHS argues that Dr. Ferguson consulted with a DIO-

---

[10] No party clarifies what GMEC stands for.

designee before placing Dr. Keenan on concern status.  (Doc. 129 at 10).  For support, MIHS cites to transcripts of Dr. Ferguson's deposition, in which she states she conferred with a DIO-designee before placing Dr. Keenan on concern status.  (Doc. 129-1 at 87). However, Dr. Keenan cites to the transcripts of Dr. Ferguson's deposition where she states that she does not remember whether the DIO-designee, Dr. John Hitt, was formally appointed by the Director of Academic Affairs.  (Doc. 127-2 at 60).  If Dr. Hitt was not appointed as the DIO designee, then MIHS would have violated its Discipline Policy. Therefore, the Court finds that there is a dispute as to material facts as to whether MIHS violated the Discipline Policy.

Dr. Keenan also argues MIHS violated the Appeals Policy when placing him on probation because Dr. Kats, who Dr. Ferguson claimed was her DIO-designee, served on the Appeals Committee for his probation, and so there was a conflict of interest.  (Doc. 127 at 7).  In addition, he argues he was not permitted to question witnesses and Dr. Ferguson during the probation hearing and that the documentation of the witness interviews was insufficient because it only consisted of "a single page lacking any material information other than the names of those individuals who spoke."  (*Id.*)[11]  MIHS does not address the issue of whether Dr. Katz had a conflict of interest or whether its documentation was sufficient.  In addition, although MIHS asserts Dr. Keenan was permitted to question some witnesses, it does not contest that Dr. Keenan was unable to question Dr. Ferguson at the probation hearing.  (Doc. 129 at 5).  At the same time, Dr. Keenan's Motion cites nothing in the record to support his assertion that he was not permitted to question Dr. Ferguson. Dr. Keenan also does not explain why Dr. Katz's position as DIO-designee would create a conflict of interest.  Finally, absent any standard established in the policy, the Court fails to see why the documentation of the probation Appeals Committee is insufficient.

In sum, the Court finds neither party has shown MIHS did or did not breach its Discipline Policy or Appeals Policies as a matter of law.  The requests to enter summary

---

[11] To be clear, Dr. Keenan's argument concerning whether MIHS policies were followed during his placement on probation, (Doc. 127 at 7), is separate from his argument that he was not afforded adequate procedural protections under the Fourteenth Amendment during his post-termination hearing.  (*Id.* at 18).

judgment on this issue is, therefore, denied.

### b.   Retaliation

Next, the Court addresses the question of whether Dr. Keenan was entitled under the Contract to be free from retaliatory behavior in all circumstances.   The Court has already found that Dr. Keenan was entitled to the protections offered in the Appeals Policy during the process that placed him on probation.   This policy explicitly prohibits retaliation. (Doc. 127-1 at 29).   Therefore, the Court rejects MIHS' argument that Dr. Keenan is not entitled to the right to be free from retaliation as it relates to his placement on probation.

There is certainly a dispute of material fact as to whether MIHS engaged in retaliatory behavior.   The Court need only reference the procedural safeguards above that may or may not have been followed to find that a reasonable jury could find that MIHS engaged in some amount of retaliatory behavior.   Although MIHS claims there can be no evidence of retaliation because the Appeals Committee's termination decision was not arbitrary, it is still possible that MIHS staff engaged in some retaliatory, albeit not arbitrary, behavior that breached Dr. Keenan's rights under the Contract.

Therefore, the Court declines to enter summary judgment on the breach of contract claims, Counts Three and Four.

## VII.   Conclusion

MIHS is entitled to summary judgment in its favor for Counts One and Two, and no party is entitled to summary judgment for Counts Three and Four.   Therefore, the only remaining claims in this matter are for breach of the Contract.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Sanctions (Doc. 139) is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 126) is **granted** in part and **denied** in part.   There being no just reason for delay, the Clerk of Court shall enter judgment as to Counts One and Two in Defendant's favor.   *See* Fed. R. Civ. P. 54(b).

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment (Doc. 127) is **denied**.

**IT IS FURTHER ORDERED** that in light of the denial of the Motion for Summary Judgment and the end of discovery, the parties are directed to file a notice of readiness for pretrial conference within ten days of the date of this Order. (*See* Doc. 19 at 8). Thereafter, the Court will issue an Order Setting Final Pretrial Conference that (a) sets deadlines for briefing motions in limine, (b) includes a form for the completion of the parties' Joint Proposed Final Pretrial Order, and (c) otherwise instructs the parties concerning their duties in preparing for the Final Pretrial Conference. A firm trial date will be set at the Final Pretrial Conference.

**IT IS FINALLY ORDERED** that the parties shall indicate when assistance from the Court is needed in seeking settlement of the case. **Upon a joint request by the parties**, the Court will refer the matter for a settlement conference before a Magistrate Judge.

Dated this 8th day of March, 2022.

Honorable Diane J. Humetewa
United States District Judge